IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| A. RICHARD CHATTERTON,<br><br>Plaintiff,<br><br><br>vs.<br><br><br>IHC HEALTH PLANS, INC.,<br><br>Defendant. | ORDER<br><br>AND<br><br>MEMORANDUM DECISION<br><br><br>Case No. 2:05-CV-130 TC |

In this ERISA case, Plaintiff A. Richard Chatterton is seeking reimbursement of medical expenses from Defendant IHC Health Plans, Inc. (IHC).  In December 2003, Mr. Chatterton underwent an elective weight loss surgical procedure.  The surgery was not covered under the Plan, and Mr. Chatterton does not seek coverage for the procedure or accompanying anesthesia expenses.  But he does seek coverage for medical expenses incurred when he developed life-threatening malignant hyperthermia (MH) immediately following the surgery.  IHC denied Mr. Chatterton's claim.  IHC explained that Mr. Chatterton's MH was a complication of the anesthesia administered during the non-covered procedure and so it too was not covered under the terms of the Plan.  Mr. Chatteron appealed the decision.

This matter comes before the court on the parties' cross motions for summary judgment. The court finds that IHC's interpretation of the Plan was reasonable and that IHC's decision was supported by substantial evidence.  In addition, the court finds that IHC gave Mr. Chatterton a full and fair review.  Accordingly, the court grants IHC's Motion for Summary Judgment and

denies Mr. Chatterton's Motion for Summary Judgment.

## I. FACTUAL BACKGROUND[1]

**A.      Mr. Chatterton's Claim**

In December 2003, Richard Chatterton, who was morbidly obese, underwent an elective

laparoscopic gastric band ("lap band") surgical procedure (requiring general anesthesia) to assist

with weight loss.  At the time, Mr. Chatterton was insured under the IHC Care PLUS Plan,

although the elective procedure and the anesthesia services were not covered by the Plan.  Dr. O.

Layton Alldredge performed the lap band surgery at the South Towne Surgery Center.  Dr. Paul

J. Diehl was the anesthesiologist.

Immediately following surgery, while in the recovery room at the surgical center, Mr.

Chatterton developed what his treating physicians suspected was malignant hyperthermia (MH).

According to one physician, Mr. Chatterton developed what appeared to be malignant

hypertension and respiratory failure with apparent ARDS [acute respiratory distress syndrome].

Mr. Chatterton also had "high CO2 and was hypoxic."  (Dr. Daniel J. Ricks' Dec. 17, 2003

Consultation Report, attached as Ex. F to Def.'s Mem. Supp. Mot. Summ. J. [hereinafter

"Defendant's Supporting Memo"].)  Another of his treating physicians said that Mr. Chatterton

"developed severe hypoxemia, hypercarbia, and signs of an extremely elevated metabolism."

(Dr. O. Layton Alldredge's Dec. 24, 2003 Discharge Summary Report (hereinafter "Alldredge

Discharge Report"), attached as Ex. G to Defendant's Supporting Memo.)  Mr. Chatterton was

---

[1]The court finds that there are no genuine disputes of material fact.

given dantrolene (a drug used to treat malignant hyperthermia)[2] before transferring him to the

intensive care unit at Alta View Hospital.  (Id.)

Mr. Chatterton was a patient at Alta View Hospital from December 11, 2003, to

December 24, 2003.  After his discharge, he received home health care through January 7, 2004.

Dr. Alldredge's discharge diagnosis was "malignant hyperthermia complicating a laparoscopic

adjustable gastric band procedure."  (Alldredge Discharge Report at 2.)

**B.      Malignant Hyperthermia**

MH is a genetic disorder that is typically triggered by anesthesia, but may also be caused

by exertion, exercise, stress, infection or sepsis, although these triggers are less common.  It can

also arise spontaneously, but this is rare.

> Malignant Hyperthermia is typically a fulminant life-threatening disease, also
> referred to as a syndrome, which occurs when a person with malignant
> hyperthermia susceptibility trait is exposed to triggering factors, which include
> most inhalational anesthetics (though not Nitrous Oxide), succinylcholine (a
> muscle relaxant used during surgery) and rarely, stress.

> Malignant Hyperthermia (MH) is an inherited muscle condition in which
> sustained contractions of muscles may occur in response to specific anaesthetic
> drugs. . . . In very rare situations, MH reactions may occur without an anaesthetic.

> Malignant hyperthermia usually occurs when a rare, inherited muscle abnormality
> causes a severe and sometimes fatal reaction to certain common anesthetics.
> Infrequently, malignant hyperthermia can be triggered in a susceptible person by
> extreme exercise or by heat stroke.

(Excerpts quoted from medical web sites by Mr. Chatterton's attorney, in June 11, 2004 e-mail to

Dr. Ray Gandolfi, attached as Ex. N to Defendant's Supporting Mem.; see also Mar. 1, 2004

_____

[2]See Dr. Diehl medical literature at CHATT0256, 258, and 282, attached as Ex. R1 to
Defendant's Supporting Memo.

Letter from Dr. Brent Wallace to IHC, attached as Ex. L2 to Defendant's Supporting Memo

(opining that a pre-surgery infection on Mr. Chatterton's leg caused the MH).)

The record reveals that, on the day of surgery, Mr. Chatterton had an infection from a sore

on his leg.  After surgery, he developed a staph infection.  Also, in the past Mr. Chatterton had

been given general anesthesia for other unrelated surgeries but apparently never developed MH.

## C.   Mr. Chatterton's Claim and IHC's Initial Review

The lap band surgery was not covered under the Plan, and Mr. Chatterton does not seek

recovery for the lap band procedure or accompanying anesthesia expenses.  But he does claim

that IHC must reimburse him for the medical expenses he incurred for treatment of the malignant

hyperthermia that developed immediately following the surgery.

Mr. Chatterton filed a claim with the Plan.  IHC reviewed his claim.  The only note in the

record about the result of the initial review reads as follows:

> RECEIVED REVIEW BY DR CHRISTENSEN, ADMISSION DENIED. "THIS
> IS STRICTLY A BENEFIT ISSUE.  ANY COMPLICATIONS ARISING FROM
> GASTRIC PROCEDURES DONE FOR TREATMENT OF OBESITY ARE
> EXCLUDED IN THE MEMBER HANDBOOK.  THIS HOSPITALIZATION IS
> A DIRECT COMPLICATION FROM THE PROCEDURE BEING DONE.
> PATIENT MAY APPEAL."

(Dec. 23, 2003 Concurrent Review Notes, attached as Ex. H to Defendant's Supporting Memo

(caps in original).)  Apparently Mr. Chatterton's claim was initially reviewed by a Dr.

Christensen.  The only thing the record reveals about the initial reviewer is that the reviewer is a

doctor and the reviewer's last name is Christensen.  Assuming a separate report exists for Dr.

Christensen's conclusion, it does not appear in the record.  And Dr. Christensen's medical

specialty and credentials are never revealed.

4

Based on Dr. Christensen's conclusion that "hospitalization is a direct complication from the procedure being done," IHC denied Mr. Chatterton's claim. IHC determined that because Mr. Chatterton's treatment was for an MH reaction to anesthesia administered during his lap band surgery, it was a complication of a non-covered procedure and so was not covered under the terms of the Plan.

IHC cites to provisions in the Plan that exclude coverage for complications arising out of uncovered surgical procedures:

**Obesity.** Treatment of all types of obesity including morbid obesity is not covered, including but not limited to surgical, medical, psychiatric/psychological, and medication services, regardless of associated medical, emotional, or psychological conditions. . . .

**Gastric Bypass.** Gastric or intestinal bypass services and <u>complications related to such services</u> are excluded. Gastric stapling for purposes of treating obesity (whether or not associated with the treatment of gastrointestinal reflux) or other similar services are also excluded as well as the reversal or revision of such procedures <u>and any complications arising from such procedures</u>.

**Non-Covered Services and Complications.** All expenses, accommodations, materials, services, and care <u>related to</u> non-Covered Services are not covered, including <u>complications resulting directly from a non-Covered Service</u>.

**Complications**. All services, equipment, and supplies provided or ordered to treat complications of a non-covered illness, injury, condition, situation, procedure, or treatment are not covered.

(Plan Ex. A at ¶¶ 15, 28, 39, 41 (emphasis added), attached as Ex. B to Defendant's Supporting Memo.)

## D.   Mr. Chatterton's First Administrative Appeal

On January 9, 2004, Mr. Chatterton appealed IHC's coverage determination. Mr. Chatterton contended that his MH was a genetic disorder, not a complication of his lap band

procedure.  IHC submitted Mr. Chatterton's appeal to Dr. Roy Gandolfi for review.  Dr.

Gandolfi, the Assistant Associate Medical Director at IHC, is an internal medicine specialist.

IHC presented him with the following case summary:

> Richard is a 55-year-old who had lap band procedure.  Post operatively he
> developed malignant hypertension [sic] and respiratory failure with apparent
> ARDS.  The patient was admitted at Alta View Hospital through the emergency
> room on December 11, 2003 through January 6, 2004.  The claims are being
> denied because they were determined to be [a] complication of the lap band
> procedure.  <u>Please review the hospital records along with the appeal from the
> member.</u>  Dr. Christensen reviewed at the UM level and denied[,] stating it was a
> complication of a non-covered procedure.

(Feb. 17, 2004 Case Summary, attached as Ex. J to Defendant's Supporting Memo (emphasis

added).)  When Dr. Gandolfi was asked to answer the question "Is this hospitalization a

complication of the Lap Band Procedure?," Dr. Gandolfi wrote "clearly complication of a

noncovered surgical procedure. Immediate post operative complication."  (Feb. 24, 2004 IHC

Consultant Review by Dr. Gandolfi, attached as Ex. J. to Defendant's Supporting Memo.)  Based

on Dr. Gandolfi's opinion, IHC denied Mr. Chatterton's appeal.  (<u>See</u> Feb. 26, 2004 Letter from

IHC Health Plans to Mr. Chatterton, attached as Ex. K to Defendant's Supporting Memo.)

**E.**     **<u>Mr. Chatterton's Second Administrative Appeal</u>**

Mr. Chatterton then appealed IHC's decision to the IHC Grievance Committee.  The

Grievance Committee typically consists of at least two administrative officers of the Plan and a

physician consultant.  In Mr. Chatterton's case, the Grievance Committee members were IHC

employees Dr. Gandolfi, Kelly Whiting, R.N., and Robbie Morris, R.N.

Mr. Chatterton presented various letters in support of his appeal.  First, Dr. Alldredge (the

doctor who performed the lap band surgery on Mr. Chatterton) stated in his letter that "[t]he

complication and subsequent hospitalization arose from the underlying disease [of malignant hyperthermia], not because of his obesity or the surgical procedure he underwent." (Feb. 16, 2004 Letter, attached as Ex. L1 to Defendant's Supporting Memo.) Second, Dr. Brent Wallace (Mr. Chatterton's primary care physician for over fifteen years) stated in his letter:

> I have reviewed his hospital record and I am concerned that much of this hospitalization was probably not related to the surgical procedure itself. It was found that he had methicillin-resistant staphylococcus aureus infection . . . . I believe the source of this to be a sore that he had on his leg before the surgery. Most likely this was not related to the surgery at all.
>
> I am also concerned that there is denial of payment for treatment of malignant hyperthermia. Malignant hyperthermia is a genetic condition that a number of different factors can trigger. . . .
>
> Given the significant amount of his treatment that was for probable sepsis with documented methicillin-resistant staphylococcus aureus which I believe to have come from his leg and the fact that malignant hyperthermia has a genetic predisposition that a number of things can trigger, I believe that reconsideration should be given to insurance payment for his hospitalization.

(Mar. 1, 2004 Letter, attached as Ex. L2 to Defendant's Supporting Memo.) Third, Dr. Paul Diehl (the anesthesiologist during Mr. Chatterton's lap band surgery) opined in his letter that "malignant hyperthermia <u>could be and has been</u> precipitated by events other than anesthesia exposure. It is my medical opinion that . . . the clinical MH course <u>could</u> have been precipitated spontaneously." (Mar. 8, 2004 Letter, attached as Ex. L3 to Defendant's Supporting Memo (emphasis added).) Dr. Mark Zenger (Mr. Chatterton's treating physician at Alta View Hospital) stated, "I do not believe the gastric bypass was what caused his problems in the hospital. It was much more the disease from the anesthesia from the malignant hyperthermia that caused his stay in the hospital." (Mar. 8, 2004 Letter, attached as Ex. L4 to Defendant's Supporting Memo.) Finally, Katie Johnson (Denial Coordinator for Alta View Hospital), on behalf of the hospital,

stated, "[t]he condition treated during this hospitalization was not a direct result of the gastric banding procedure." (Apr. 20, 2004 Letter, attached as L5 to Defendant's Supporting Memo.) Mr. Chatterton did not submit any evidence to the Grievance Committee that he experienced stress, extreme exercise or heat stroke before his MH developed.

During the June 10, 2004 Grievance Committee hearing, Mr. Chatterton's attorney, as well as Dr. Alldredge, Dr. Wallace, and Katie Johnson, appeared on Mr. Chatterton's behalf and reiterated their views on the issue. The Grievance Committee minutes set forth the Committee Decision and Rationale:

> The Committee discussed the arguments presented and reviewed all the submitted information. The Committee upheld the original denial. <u>Based on the opinion of another UM Medical Director, Dr. Curtis Andersen, malignant hyperthermia is a direct result of anesthesia.</u> If Mr. Chatterton had not had the LapBand procedure, he would not have had the anesthesia, therefore, the malignant hyperthermia is a complication of a non-covered procedure.

(Grievance Committee Minutes, attached as Ex. M to Defendant's Supporting Memo (emphasis added).)

This is the first reference in the record to Dr. Curtis Andersen and his opinion. Dr. Andersen is an Assistant IHC Medical Director and family practice specialist.[3] His opinion was sought in the following e-mail from Heidi Maw, IHC's Appeals Coordinator:

> Dr. A,
>
> We had a case on Thursday that I would like to get your opinion on. This man had a Lap-Band procedure and in the recovery room it was determined that he had malignant hyperthermia. He was given the antedote [sic] and taken to Alta View

---

[3]IHC is incorrect when it refers to Dr. Andersen as an anesthesiologist. Although he may have done a residency in anesthesiology at one time, he is not practicing as an anesthesiologist but rather as a family practice specialist.

[Hospital] and admitted.  When IHC received the claims, they were denied as a complication of a non-covered service.  Now, prior to this surgery, this man also had surgery to remove scar tissue from a previous prostatectomy, in which he developed an infection.  While he was in Alta View he got sepsis and was treated with antibiotics.  He also had a wound on his leg.  <u>Now, is it possible that the hyperthermia was triggered by the prior infection, or the wound on his leg?  Or, was it brought on by the anesthesia used for the Lap-Band procedure?</u>  If it was related to the anesthesia, would you consider this a complication of the Lap-Band procedure, or is it a separate incident?  Sorry to bug you on your vacation, but just wanted your opinion based on your anesthesia background.  Thanks.

(June 12, 2004 E-Mail from Heidi Maw to Dr. Curtis Andersen, attached as Ex. O to Defendant's

Supporting Memo (emphasis added).)  Dr. Andersen responded:

Malignant Hyperthermia is a direct result of anesthesia, not infection.  Consequently, <u>had he not undergone Lap Band it would not have occurred.  I would consider it a complication of general anesthesia</u> which was performed for the Lap Band procedure, therefore, (in my humble opinion) it should not be covered.

(<u>Id.</u> (emphasis added).)

As noted above, the committee upheld the original denial.  But Dr. Gandolfi abstained

from voting because he had issued the initial opinion that resulted in the second denial of Mr.

Chatterton's claim, so the remaining committee members, two registered nurses, made the

decision.

## F.    Mr. Chatterton's Third and Final Administrative Appeal

Mr. Chatterton appealed the Grievance Committee Determination to the IHC Appeals

Committee.  Before the committee met with Mr. Chatterton, Heidi Maw (IHC's Appeals

Coordinator) arranged for a third-party expert medical reviewer to review the claim and provide

an independent expert's opinion.

On September 29, 2004, Mr. Chatterton, his counsel, and Dr. Diehl met with the

committee.  Committee members present were Sidney C. Paulson (President of IHC Health

Plans, Inc.), Patrice Arent (consumer representative), Tom Morgan (a member of the IHC Board

of Trustees), John Nielson (an attorney in the IHC legal department), Dr. Stephen Taylor (an

emergency medicine doctor), Scott Pugsley (Legal Counsel for IHC Health Plans, Inc.), Dr. Ken

Schaecher (Medical Director for IHC Health Plans, Inc.), Emily Matthews (Customer Relations

for IHC Health Plans, Inc.), and LaRue Linderman (Appeals Coordinator, IHC Health Plans,

Inc.).

Mr. Chatterton submitted additional information to the committee in support of his claim.

Specifically, he submitted a letter from his attorney enclosing medical literature provided by Dr.

Diehl.  According to Mr. Chatterton's counsel, the literature "clearly demonstrates that malignant

hyperthermia may occur without an anaesthetic."  (July 6, 2004 Letter from Mark Richards to

Heidi Maw, attached as Ex. R1 to Defendant's Supporting Memo (emphasis added).)  The

medical literature provided by Dr. Diehl includes the following statements regarding malignant

hyperthermia:

> Malignant hyperthermia is a group of inherited muscle problems characterized by
> muscle breakdown following certain stimuli – such as anesthesia, extremes of
> exercise (particularly in hot conditions), fever, or use of stimulant drugs. . . .
> Malignant hyperthermia is often noted for the first time during administration of
> anesthesia.[CHATT0253.]

> MH reactions may occur without an anesthetic. [CHATT0256.]

> Recognition of a clinical episode of malignant hyperthermia (MH) remains a
> problem for the anesthesiologist. . . . Large muscle bulk and recent exercise are
> also common in patients developing MH. . . . MH like symptoms can occur
> without exposure to anesthetic drugs.  MH may occur . . . with exercise rather than
> anesthesia.  [CHATT0257.]

> Malignant Hyperthermia: The Disease of Anesthesia . . . [describing "classical

10

MH" as "anesthesia induced MH"] . . . [noting that MH has been linked to exercise in individuals who are genetically susceptible to MH] . . . <u>MIMICS OF MH</u> A variety of unusual conditions may resemble MH during anesthesia. These include sepsis, thyroid storm. Pheochromocytoma, iatrogenic overheating. . . . In other words, the response to dantrolene does not per se prove MH susceptibility. [CHATT0277-80.]

(Diehl Medical Literature, attached as Ex. R1 to Defendant's Supporting Memo.)

Mr. Chatterton also submitted a second letter from his primary care physician, Dr.

Wallace.  In Dr. Wallace's letter to members of the IHC Appeals Committee, Dr. Wallace opined

as follows:

Although [Mr. Chatterton's respiratory distress, hypoxia and high CO2 levels] occurred shortly post op, I don't believe it can be said that this was all due to his obesity surgery.  Malignant hyperthermia is due to a genetic condition, not being caused by obesity surgery, <u>although the anesthetic likely triggered it in [Mr. Chatterton]</u>.  As his hospitalization progressed he was also treated for <u>probable hospital acquired infection</u> that would have <u>more likely been acquired at Altaview</u> than at the surgical center.

In addition to this, an absolutely positive diagnosis was never made during the hospitalization.  It was assumed to be malignant hyperthermia, but he never had hyperthermia (possibly due to quick administration of dantrolene) and he never had myoglobinuria – both of which are hallmarks of malignant hyperthermia. Without a definitive diagnosis I think it is impossible to conclude with certainty that there is a cause and effect between his obesity surgery and his hospitalization.

<u>Due to the uncertainty of cause and effect, and due to the fact that malignant hyperthermia is due to an abnormal genetic condition</u>, I believe it would be prudent for healthplans to cover this medical expense.

(Sept. 26, 2004 Letter, attached as Ex. R2 to Defendant's Supporting Memo (emphasis added).)

In addition to the above-described material, the committee had before it the opinion of an

independent medical reviewer that IHC engaged through third-party Hayes Plus, Inc.  The

independent medical reviewer remained anonymous until after this litigation was filed.  His

credentials were represented to IHC by Hayes Plus as follows:

> **Reviewer #S090.** Is board certified in surgery with expertise in bariatric surgery. Currently serves as Teaching Attending and Chief, Section of Surgical Nutrition, at an [sic] university affiliated medical center and as a staff surgeon at several hospitals.  Is an active member of several professional associations.  Is published in peer reviewed literature.

(July 14, 2004 Letter, attached as Ex. T to Defendant's Supporting Memo.)  Paul H. Steerman was the reviewing doctor, but his name, credentials, and curriculum vitae were not disclosed to Mr. Chatterton during the administrative review process.[4]

In Dr. Steerman's report,[5] he answered four questions presented to him by Heidi Maw.[6] Dr. Steerman stated that he had sufficient and appropriate information and documentation to make his determination, but his report does not list what materials he reviewed before giving his opinion.

_____

[4]In his summary judgment papers, Mr. Chatterton moves to strike the report of Dr. Steerman.  (See Pl.'s Consol. Mem. at pp. ix, 7; Pl.'s Reply Mem. at pp. ii-iii, 2-3.)  Mr. Chatterton did not file a formal motion under Federal Rule of Procedure 37.  As the basis for his motion, Mr. Chatterton contends that Dr. Steerman's report and CV were not properly disclosed during the administrative appeals process or litigation-related discovery.  The court denies the request to strike.  The issue of disclosure during the administrative appeals process is better dealt with in the context of whether IHC violated ERISA procedures.

[5]Mr. Chatterton complains that the report is not signed by Dr. Steerman.  The lack of signature is consistent with Hayes Plus's intention to maintain the anonymity of the reviewer. And nothing in the record, absent speculation from the Plaintiff, suggests that the report is not Dr. Steerman's.

[6]Those questions were: (1) "Is there adequate information about the patient's diagnosis, history and requested treatment to answer the question's [sic] submitted?  If no, please state the additional medical record information required."; (2) "Was the patient's episode of malignant hyperthermia secondary to anesthetics given for the Lap Band surgery?"; (3) "Would this condition 'malignant hyperthermia' have occurred at this time or at the time this patient experienced malignant hyperthermia without administration of anesthesia?"; and (4) "Was the anesthesia given to allow performance of bariatric surgery and does [sic] the plan guidelines exclude coverage of bariatric surgery and its complications?"  (Ex. T to Defendant's Supporting Memo.)

12

Dr. Steerman concluded that Mr. Chatterton's malignant hyperthermia would not have occurred if Mr. Chatterton had not been given the anesthesia for the lap band surgery.  In response to the question of whether the malignant hyperthermia would have occurred without administration of anesthesia, Dr. Steerman responded:

> The patient has had multiple prior surgical procedures . . . . Though the anesthetic agents used during these procedures have not been documented, there isn't any mention in the patient's history stating that he has had malignant hyperthermia complications in the past from either surgery or infection.  There isn't any documentation provided that would make one believe that the present episode of malignant hyperthermia was not a direct complication of the anesthesia given at the time of Lap Band [surgery].  The malignant hyperthermia occurred in the immediate postoperative period before an infection could even occur.

(Dr. Steerman's Report, attached as Ex. T to Defendant's Supporting Memo (emphasis added).)

Dr. Steerman's statement "before an infection could even occur" suggests that he was not presented with Dr. Brent Wallace's statement that Mr. Chatterton went into surgery with an infection in his leg.

The IHC Appeals Committee upheld the Grievance Committee's decision to deny Mr. Chatterton's claim.  According to the minutes of the review meeting:

> **CASE OF A. RICHARD (Dick) CHATTERTON:** Mr. Richard Chatterton, Attorney Mark Richards, and Dr. Paul Diehl, met with the Appeals Committee regarding Mr. Chatterton's request for coverage of the inpatient services he received from December 11, 2003 through January 6, 2004 at Alta View Hospital. Mr. Chatterton stated on December 11, 2003, he electively underwent a gastric laparoscopic banding ("lap band") for morbid obesity.  While in the recovery room, Mr. Chatterton developed malignant hyperthermia, a genetic disease that may be triggered by exposure to anesthetics, stress, overexertion or infection.  Dr. Paul Diehl provided a summary of the disease and stated the reason for Mr. Chatterton's malignant hyperthermia condition wasn't the surgery but the anesthesia.  Mr. Chatterton stated prior to his surgery, he had experienced an infection caused by a piece of wood embedded in his leg.  Mr. Mark Richards stated he believes Mr. Chatterton's malignant hyperthermia was caused by the anesthesia and not caused by the lap band procedure.  After discussion, the

Committee agreed to deny the Appeal and uphold the decision of the Grievance Committee.

(Sept. 29, 2004 IHC Health Plans Appeals Committee Meeting Minutes, attached as Ex. S to Defendant's Supporting Memo (emphasis in original).)

The IHC Appeals Committee sent a letter to Mr. Chatterton denying his claim. The author of the letter, Chairman Sidney C. Paulson, stated:

> Your health plan excludes coverage of lap-band surgery for obesity, and also excludes coverage of medical problems that are complications of a procedure, such as obesity surgery, that is not covered by IHC Health Plans. Malignant hyperthermia is a recognized, if rare, complication usually triggered by anesthesia. The physicians who reviewed this matter agreed the malignant hyperthermia was triggered by, and thus was a complication of, the anesthesia you received in connection with the lap-band surgery, and it is very unlikely you would have had this particular problem if you had not had the obesity surgery. There was thus no question for the committee but that the malignant hyperthermia is a complication of a non-covered procedure.

(Oct. 4, 2004 Letter from Sidney Paulson to Mr. Chatterton, attached as Ex. U to Defendant's Supporting Memo.)

Following the IHC Appeals Committee denial of his claim, Mr. Chatterton filed the present suit under ERISA.

## II. ANALYSIS

Mr. Chatterton brings his claim under the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1132(a)(1)(B) (empowering plan participant to bring a civil action to recover benefits due to him under the terms of his plan). The parties have filed cross motions for summary judgment.

IHC contends that it properly denied Mr. Chatterton's claim for medical expenses relating to his malignant hyperthermia treatment because such expenses are not covered by the Plan.

14

Specifically, IHC asserts that Mr. Chatterton's malignant hyperthermia was not covered because it was "related to" and was a complication "resulting directly from" the anesthesia administered during the non-covered lap band procedure.

Mr. Chatterton contends that IHC's motion must be denied because IHC has not met its burden of presenting substantial evidence that Mr. Chatterton's claim is not covered under the Plan, and, furthermore, IHC did not give Mr. Chatterton the "full and fair review" required by ERISA and its implementing regulations. Mr. Chatterton asserts that IHC acted arbitrarily and capriciously and violated its fiduciary obligations under ERISA by acting like "an adversary bent on denial." Mr. Chatterton seeks reimbursement of his medical expenses, attorneys' fees, and pre-judgment interest.

**A.**     **Legal Standard and Scope of Review**

    **1.**     **Summary Judgment Standard**

Federal Rule of Civil Procedure 56 permits the entry of summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" Fed. R. Civ. P. 56(c);  see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-51 (1986); Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 670 (10th Cir. 1998).

    **2.**     **ERISA Standards of Review**

In addition to the traditional summary judgment standard, the court must determine whether IHC's decision to deny benefits should be reviewed *de novo* or under the deferential abuse of discretion standard. Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989).

If the Plan grants discretion to the Plan administrator or fiduciary to determine benefit eligibility or to construe terms of the Plan, the court must review the decision for abuse of discretion, otherwise referred to as the deferential arbitrary and capricious standard.  Id.; Sandoval v. Aetna Life & Cas. Ins. Co., 967 F.2d 377, 379-80 (10th Cir. 1992).  Because the Plan does grant IHC, the Plan administrator, discretionary authority to determine eligibility for benefits, the court will review the decision under the arbitrary and capricious standard.

Under the arbitrary and capricious standard, the court must determine whether the Plan administrator's interpretation was "reasonable and made in good faith."  Hickman v. GEM Ins. Co., Inc., 299 F.3d 1208, 1213 (10th Cir. 2002).  But because IHC was acting both as insurer and as claims fiduciary, it has an inherent conflict of interest, which affects the analysis.  Fought v. UNUM Life Ins. Co. of Am., 379 F.3d 997, 1003 (10th Cir. 2004) (shifting burden to plan administrator and noting that the conflict of interest must be weighed as factor in determining whether there was abuse of discretion).  In a situation where a conflict of interest exists, the Tenth Circuit has adopted what it calls the "sliding scale approach."  Id. at 1004.

> Under [the sliding scale] approach, the reviewing court will always apply an arbitrary and capricious standard, but the court must decrease the level of deference given to the conflicted administrator's decision in proportion to the seriousness of the conflict.

Chambers v. Family Health Plan Corp., 100 F.3d 818, 825 (10th Cir. 1996) (emphasis added).  Given these standards, IHC bears the burden of demonstrating

> that its interpretation of the terms of the plan is reasonable and that its application of those terms to the claimant is supported by substantial evidence.  The district court must take a hard look at the evidence and arguments presented to the plan administrator to ensure that the decision was a reasoned application of the terms of the plan to the particular case, untainted by the conflict of interest.

16

Fought, 379 F.3d at 1006 (emphasis added).  "Substantial evidence" is "such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the [decision maker]."  Caldwell v. Life Ins. Co. of N. Am., 287 F.3d 1276, 1282 (10th Cir. 2002) (internal citations omitted).

The court also notes that "[u]nder ERISA, an insurer bears the burden to prove facts supporting an exclusion of coverage."  Fought, 379 F.3d at 1007 (emphasis added).  That is, IHC must prove by a preponderance of the evidence that Mr. Chatterton's malignant hyperthermia is excluded from coverage under the Plan.  Id.

Finally, the court's review under the arbitrary and capricious standard must be limited to the administrative record – that is, "'the materials compiled by administrator in the course of making his decision.'"  Allison v. UNUM Life Ins. Co. of Am., 381 F.3d 1015, 1021 (10th Cir. 2004) (quoting Hall v. UNUM Life Ins. Co. of Am., 300 F.3d 1197, 1201 (10th Cir. 2002)); Kimber v. Thiokol Corp., 196 F.3d 1092, 1098 (10th Cir. 1999) (holding that evidence was limited to that which was presented up until the administrator's final decision denying benefits); Sandoval v. Aetna Life & Cas. Ins. Co., 967 F.2d 377, 380 (10th Cir. 1992).  That means that the court will not consider the evidence presented for the first time during this litigation to determine whether IHC's adverse benefit determination was arbitrary and capricious.  But some of the evidence is relevant to the court's determination of whether IHC granted Mr. Chatterton a "full and fair review," a question independent of the analysis of whether IHC's decision itself was arbitrary and capricious.  The court will only consider such evidence to the extent that it serves that narrow purpose.

17

**B.** **IHC's Adverse Benefit Determination was Supported by Substantial Evidence.**

In support of its adverse benefit determination, IHC cites to a provision in the Plan that excludes coverage for complications arising out of elective, uncovered surgical procedures. The exclusionary language in the Plan reads in relevant part as follows:

**Obesity.** Treatment of all types of obesity including morbid obesity is not covered, including but not limited to surgical, medical, psychiatric/psychological, and medication services, regardless of associated medical, emotional, or psychological conditions. . . .

**Gastric Bypass.** Gastric or intestinal bypass services and complications related to such services are excluded. Gastric stapling for purposes of treating obesity (whether or not associated with the treatment of gastrointestinal reflux) or other similar services are also excluded as well as the reversal or revision of such procedures and any complications arising from such procedures. . . .

**Non-Covered Services and Complications.** All expenses, accommodations, materials, services, and care related to non-Covered Services are not covered, including complications resulting directly from a non-Covered Service. . . .

**Complications**. All services, equipment, and supplies provided or ordered to treat complications of a non-covered illness, injury, condition, situation, procedure, or treatment are not covered. . . .

(Plan Ex. A at ¶¶ 15, 28, 39, 41 (emphasis added), attached as Ex. B to Defendant's Supporting Memo.) According to IHC's interpretation of the Plan's language, treatment of morbid obesity, gastric or intestinal bypass services; services related to non-covered services (such as anesthesia for an elective lap band surgical procedure); and complications resulting directly from a non-covered service are all excluded from coverage. That is, IHC determined that the Plan language specifically expands the scope of the exclusion of non-covered services to services, treatment and expenses that relate to, arise from or result directly from the non-covered medical services. IHC's interpretation of the Plan language was reasonable.

18

Mr. Chatterton contends that his MH reaction was covered under the Plan because his MH was not caused by his morbid obesity or lap band surgery. But the question is not whether the malignant hyperthermia was caused by the lap band surgery. There is no dispute that the lap band procedure itself was a non-covered service. The anesthesia, too, was a non-covered service under the Plan. (See id. ("Non-Covered Services and Complications").) Indeed, Mr. Chatterton paid Dr. Diehl directly for the anesthesia services, and he does not claim that those services were covered under the Plan. Rather, the question is whether the malignant hyperthermia was a complication of the anesthesia administered during the lap band surgery.

Substantial evidence supports IHC's decision that it was. The issue raised in Mr. Chatterton's case needed to be resolved by reference to a physician's medical judgment. The majority of doctors (even those whose opinions were offered to support Mr. Chatterton's appeal) concluded that Mr. Chatterton's MH was triggered by the anesthesia. Of the doctors who equivocated (most notably Dr. Diehl), they still said it was possible that anesthesia triggered the reaction. And the medical literature provided additional support for IHC's conclusion that anesthesia triggered Mr. Chatterton's MH. The literature indicates that anesthesia is the most common trigger, that other causes are not nearly as common, and that the spontaneous development of MH is rare. Given the fact that Dr. Diehl offered no more than a theoretical explanation for Mr. Chatterton's MH ("It is my medical opinion that . . . the clinical MH course could have been precipitated spontaneously" (see Mar. 8, 2004 Letter (attached as Ex. L3 to Def.'s Supporting Memo.) (emphasis added)), and given the fact that spontaneous development of MH is rare, IHC did not act arbitrarily by relying on the other physicians' opinions. Also, the fact that malignant hyperthermia is a genetic disorder does not negate IHC's conclusion that Mr.

Chatterton's treatment for his MH reaction was related to, arose from, and was a direct

consequence of the anesthesia that was administered solely to perform a non-covered surgical

procedure.  IHC is entitled to summary judgment on this issue.

**C.**     **IHC Provided Mr. Chatterton With a Full and Fair Review.**

Mr. Chatterton contends that IHC did not give him the "full and fair review" required by

ERISA, 29 U.S.C. § 1133(2), and its implementing regulations, 29 C.F.R. § 2560.503-1 (setting

forth claims procedures).  Accordingly, he contends, he is entitled to reimbursement of his

medical expenses related to the treatment of his malignant hyperthermia.  Specifically, Mr.

Chatterton alleges that IHC violated the ERISA "full and fair review" procedures in the

following ways:

> a.     IHC did not provide for an independent expert to review the claim, in violation of 29 C.F.R. § 2560.503-1(h) (generally requiring "full and fair review" on appeal);
>
> b.     IHC reviewers gave deference to the initial adverse decision, in violation of 29 C.F.R. § 2560.503-1(h)(3)(ii);
>
> c.     IHC failed to have a qualified specialist review the claim, in violation of 29 C.F.R. § 2560.503-1(h)(3)(iii);
>
> d.     IHC failed to fully identify its reviewers, in violation of 29 C.F.R. § 2560.503-1(h)(3)(iv);
>
> e.     IHC failed to have the claim reviewed by an unrelated and qualified medical reviewer at each level of appeal, in violation of 29 C.F.R. § 2560.503-1(h)(3)(v);
>
> f.     IHC did not take into account all information submitted by Mr. Chatterton, in violation of 29 C.F.R. § 2560.503-1(h)(2)(iv); and
>
> g.     IHC failed or refused to produce its reviewers' credentials and opinions upon written request, in violation of 29 C.F.R. § 2560.503-1(h) (generally requiring "full and fair review" on appeal).

(Pl.'s Consol. Mem. Supp. Mot. Summ. J. at 5-15.)  Mr. Chatterton characterizes IHC's

combined actions as those of an "adversary bent on denial" and argues that IHC's actions were

egregious enough to warrant an order compelling IHC to pay Mr. Chatterton's medical expenses.

(Pl.'s Consol. Mem. Supp. Mot. Summ. J. at 1, 15.)

Mr. Chatterton's request raises two questions.  First, did IHC violate the "full and fair

review" procedural requirements?  Second, if it did, do IHC's actions warrant the remedy that

Mr. Chatterton seeks?

### 1.    Standards

ERISA provides that "every employee benefit shall . . . afford a <u>reasonable opportunity</u> to

any participant whose claim for benefits has been denied <u>for a full and fair review</u> by the

appropriate named fiduciary of the decision denying the claim." 29 U.S.C. § 1133(2) (emphasis

added).  The words "'full and fair review' must be construed . . . to protect a plan participant

from arbitrary or unprincipled decision-making."  <u>Grossmuller v. Int'l Union, United Auto.</u>

<u>Aerospace & Agric. Implement Workers of Am., UAW, Local 813,</u> 715 F.2d 853, 857 (3d Cir.

1983).  "A full and fair review means 'knowing what evidence the decision-maker relied upon,

having an opportunity to address the accuracy and reliability of the evidence, and having the

decision-maker consider the evidence presented by both parties prior to reaching and rendering

his decision.'" <u>Sage v. Automation, Inc. Pension Plan & Trust,</u> 845 F.2d 885, 893-94 (10th Cir.

1988) (internal citation omitted).  But an administrator's substantial compliance with § 1133 is

sufficient to satisfy the ERISA procedural requirements.  <u>Hickman v. Gem Ins. Co., Inc.,</u> 299

F.3d 1208, 1215 (10th Cir. 2002).

As for the remedy Mr. Chatterton seeks, generally no substantive remedy is available for

violation of the "full and fair review" procedural requirement in 29 U.S.C. § 1133.  <u>Walter v.</u>

International Ass'n of Machinists Pension Fund, 949 F.2d 310, 316 (10th Cir. 1991).

> The remedy when an ERISA administrator fails to make adequate findings or to
> explain adequately the grounds of her decision [under 29 U.S.C. § 1133] is to
> remand the case to the administrator for further findings or explanation.  <u>A
> remand for further action is unnecessary only if the evidence clearly shows that
> the administrator's actions were arbitrary and capricious</u>.

Caldwell v. Life Ins. Co. of N. Am., 287 F.3d 1276, 1288-89 (10th Cir. 2002) (internal citations

omitted) (emphasis added).  Essentially, an award of benefits may be appropriate if the court

finds that the procedural violation was so egregious that it resulted in substantive harm.

According to the Ninth Circuit,

> "[o]rdinarily, a claimant who suffers because of fiduciary's failure to comply with
> ERISA's procedural requirements is entitled to no substantive remedy," but that if
> procedural violations results in "substantive harm," then "a court must consider
> [such violations] in determining whether the decision to deny benefits in a
> particular case was arbitrary and capricious."

Jebian v. Hewlett-Packard Co. Employee Benefits Org. Income Protection Plan, 349 F.3d 1098,

1105 (9th Cir. 2003) (quoting Blau v. Del Monte Corp., 748 F.2d 1348, 1353-54 (9th Cir. 1984)).

See also, e.g., Schleibaum v. Kmart Corp., 153 F.3d 496, 504 (7th Cir. 1998) (holding that if

procedural violation caused substantive harm, court may exercise its equitable powers to fashion

an appropriate measure of damages); Veilleux v. Atochem N. Am., Inc., 929 F.2d 74, 76 (2d Cir.

1991) (noting in dictum that procedural violations resulting in substantive harm may warrant

granting of benefits sought by claimant); Clark v. Bank of New York, 801 F. Supp. 1182, 1195-

96 (S.D.N.Y. 1992) (holding that sufficiently egregious procedural violation may warrant award

of benefits as remedy).

**2.      IHC substantially complied with its obligation to provide Mr. Chatterton with a full and fair review.**

      a.    <u>IHC did provide for an independent expert to review the claim.</u>

The court finds that IHC's reliance on Dr. Paul H. Steerman's opinion satisfied the any requirement that IHC provide an independent expert to review the claim.  There is no question that Dr. Steerman is not associated with IHC.  The fact that Dr. Steerman remained anonymous during the review procedure does not make him any less independent.

      b.    <u>IHC reviewers did not give deference to the initial adverse decision by Dr. Christensen.</u>

ERISA regulations require that the administrator "[p]rovide for a review that does not afford deference to the initial adverse benefit determination and that is conducted by an appropriate named fiduciary of the plan who is neither the individual who made the adverse benefit determination that is the subject of the appeal, nor the subordinate of such individual." 29 C.F.R. § 2560.503-1(h)(3)(ii).  Dr. Christensen made the initial coverage determination and was not involved in the appeals process.  Mr. Chatterton's assertion that Dr. Christensen's determination somehow "poisoned the well" as to all subsequent administrative reviews of that claim is not persuasive.  If an initial coverage determination was sufficient to "poison the well," the appeal processes under all benefit plans would be rendered meaningless.  Moreover, nothing in the record suggests that the other reviewers based their determinations on Dr. Christensen's very brief report.  The process necessarily requires that the reviewers be aware of the initial adverse determination.  But the fact that they were aware of it proves nothing.

      c.    <u>IHC did not fail to have a qualified specialist review the claim.</u>

ERISA regulations require that the administrator "in deciding an appeal of any adverse

benefit determination that is based in whole or in part on a medical judgment, . . . <u>shall consult with a health care professional who has appropriate training and experience in the field of medicine involved in the medical judgment</u>."  29 C.F.R. § 2560.503-1(h)(3)(iii) (emphasis added).  That requirement applies here because the determination certainly is based, at least in part, on a medical judgment regarding whether Mr. Chatterton's malignant hyperthermia was a complication of the surgery.

But Mr. Chatterton's contention that an anesthesiologist is the <u>only</u> health care professional with the appropriate training and experience to make such a medical judgment goes too far.  Mr. Chatterton's interpretation of the regulatory provision is too narrow.  Indeed, Mr. Chatterton himself relies on opinions from other medical professionals who are not anesthesiologists.  Arguably, in this case the "field of medicine involved in the medical judgment" is not solely anesthesiology.  It makes no sense to say that the only medical professional qualified to diagnose malignant hyperthermia and determine its cause would be an anesthesiologist.  For instance, the record shows that Mr. Chatterton's malignant hyperthermia was successfully diagnosed and treated by physicians trained in other fields.[7]

Moreover, IHC did have and consider the opinion of an anesthesiologist: Dr. Paul Diehl.  The fact that IHC may have subsequently discounted or disregarded Dr. Diehl's opinion because

---

[7]The vast majority of evidence in the record shows that Mr. Chatterton had malignant hyperthermia.  The ambivalent suggestion that he may not have actually developed the disease at all (<u>see</u> Pl.'s Consol. Mem. Supp. Mot. Summ. J. at p. xiv ¶ 22 (quoting Sept. 26, 2004 Letter from Dr. Brent Wallace to IHC, attached as Ex. R2 to Defendant's Supporting Memo)) is simply overwhelmed by contrary evidence.

it was only a theoretical explanation[8] does not change the fact that IHC adhered to its procedural obligations.  Moreover, "[n]othing in ERISA 'suggests that plan administrators must accord special deference to the opinions of treating physicians.  Nor does the Act impose a heightened burden of explanation on administrators when they reject a treating physician's opinion.'" Smith v. Metropolitan Life Ins. Co., 344 F. Supp. 2d 696, 703-04 (D. Colo. 2004) (quoting Black & Decker Disability Plan v. Nord, 538 U.S. 822, 831 (2003)).

The court finds that IHC did not violate the requirement that it consult a qualified health care professional at some point during the appeals process.

d.      IHC did fail to fully identify at least one of its reviewers.

ERISA regulations require that the administrator identify "medical or vocational experts whose advice was obtained on behalf of the plan in connection with a claimant's adverse benefit determination, without regard to whether the advice was relied upon in making the benefit determination."  29 C.F.R. § 2560.503-1(h)(3)(iv).  The court believes that IHC did fail in this obligation when it did not identify Dr. Steerman until after Mr. Chatterton filed his ERISA suit in court.[9]  But, as discussed below, the impact of this does not rise to the level of substantive harm justifying an award of damages.

_____

[8]"[M]alignant hyperthermia could be and has been precipitated by events other than anesthesia exposure.  It is my medical opinion . . . that the clinical MH course could have been precipitated spontaneously."  (Mar. 8, 2004 Letter from Dr. Paul Diehl to IHC, attached as Ex. L3 to Defendant's Supporting Memo (emphasis added).)

[9]Mr. Chatterton contends that IHC's failure to identify "Dr. Christensen" with more specificity violated the ERISA procedural requirement.  But the procedural requirement relates to the appeals process, and Dr. Christensen was not part of the appeals process.  So, technically there was no violation.  The fact that Dr. Christensen is not further identified in the record at any time including during this litigation is troubling.  But the situation does not change the overall decision.

      e.     <u>IHC substantially complied with its obligation to consult with an unrelated and qualified medical reviewer at each level of appeal.</u>

ERISA regulations require that the administrator "[p]rovide that the health care professional engaged for purposes of a consultation under paragraph (h)(3)(iii) of this section shall be an individual who is <u>neither an individual who was consulted in connection with the adverse benefit determination that is the subject of the appeal, nor the subordinate of any such individual</u> . . . ." 29 C.F.R. § 2560.503-1(h)(3)(v) (emphasis added). And the Plan states that "[a]t each level in the appeal process, . . . decisions will be made by appropriately named fiduciaries of the Plan who did not make the Adverse Benefit Determination and who do not report to anyone who did." (Plan ¶ 7.8.6 at 43.)

IHC did not violate this requirement even though IHC's decision to appoint Dr. Gandolfi to the Grievance Committee in this particular case required him to review his own denial of the claim. And Dr. Gandolfi's recusal from voting did not entirely cure the problem created by his presence because he apparently took part in the discussion. But the record shows that Dr. Andersen's opinion, not Dr. Gandolfi's, was the basis for the Grievance Committee's denial. That is, Dr. Andersen was the unrelated and qualified medical reviewer. Therefore, IHC substantially complied with the requirement set forth in § 2560.503-1(h)(3)(v).

      f.     <u>The record supports the conclusion that IHC did take into account the information submitted by Mr. Chatterton.</u>

ERISA regulations require the administrator to "[p]rovide for a review that takes into account all comments, documents, records, and other information submitted by the claimant relating to the claim, without regard to whether such information was submitted or considered in the initial benefit determination." 29 C.F.R. § 2560.503-1(h)(2)(iv). Mr. Chatterton speculates

that IHC ignored the information he provided.  But the evidence shows that IHC actually

investigated whether Mr. Chatterton's malignant hyperthermia could have been caused by

something other than anesthesia.  For example, the Grievance Committee Minutes and the

Appeals Committee Minutes indicate that each committee, when making its determination,

specifically took into account Mr. Chatterton's assertion that malignant hyperthermia could be

caused by infection, overexertion or stress rather than the anesthesia.  And the IHC Appeals

Coordinator specifically asked Dr. Andersen whether it was possible that the malignant

hyperthermia was triggered by a pre-surgery infection or the wound on Mr. Chatterton's leg.  The

record supports the conclusion that IHC did consider all of the information provided to it.

> g.      IHC did not fail or refuse to produce its reviewers' credentials and
>         opinions upon written request.

The Plan states that IHC will, upon a claimant's request, identify the medical

professionals upon whose opinion the claim determination was based.  (Plan ¶ 7.8.6 at 44.)

Nothing in the record supports Mr. Chatterton's claim that IHC failed or refused to produce its

reviewers' credential upon written request during the appeals procedure.  It does not appear that

any request was ever submitted during the appeals process (the first request came after the final

decision had been made).

> h.      To the extent IHC did not fully comply with its procedural duties, its
>         failings in that area did not cause substantive harm to Mr. Chatterton
>         justifying an award of damages.

Arguably, IHC did not follow the procedural rules set forth in 29 C.F.R. § 2560.503-1(h)

to the extent that it probably should or could have.  But the procedural violations that occurred

did not cause substantive harm to Mr. Chatterton.  Although his claim was denied, there is more

than enough evidence in the record to support IHC's decision.  In other words, If IHC had followed all of the procedures to the letter, the new information added to the record and the increased opportunities for response by Mr. Chatterton would not alter the substantive outcome.

Mr. Chatterton and his attorneys were not working in a vacuum.  The basis for IHC's decision was always made clear.  Mr. Chatterton and his attorneys had, and took advantage of, at least three opportunities to present evidence.  IHC consulted a qualified independent reviewer—Dr. Steerman—during the process.  And IHC supplied enough information to Mr. Chatterton to allow the Plaintiff to independently research and verify the credentials of Dr. Steerman.

Mr. Chatterton implies that the record is lacking in certain evidence and that such a lack indicates that the review was not "full and fair."  At first glance, one could reasonably believe that the doctors' and decision-makers' rather perfunctory responses suggest a hasty and unthoughtful review.  But a closer look reveals that IHC asked proper questions, gathered a variety of information, and, apparently, asked a question that the majority of reviewing doctors, including the independent reviewer, found straightforward and simple to answer.  Therefore, it appears that Mr. Chatterton received a full and fair review of what in the end appears to have been a relatively straightforward issue to resolve.  Accordingly, Mr. Chatterton is not entitled to summary judgment on this issue.

**ORDER**

For the foregoing reasons, Mr. Chatterton's Motion for Summary Judgment is DENIED

and IHC's Motion for Summary Judgment is GRANTED.

DATED this 20th day of April, 2006.

BY THE COURT:

TENA CAMPBELL
United States District Judge